## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

MICA ALEXANDER MARTINEZ,     )
)
       Petitioner,      )
)
v.                 )     Case No. CIV-16-1278-D
)
JIM FARRIS, Warden,       )
Oklahoma State Penitentiary,   )
)
       Respondent.     )

## MEMORANDUM OPINION AND ORDER

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254 ("Petition"). [Doc. No. 16]. Petitioner challenges the conviction and sentence entered against him in Comanche County District Court Case No. CF-2009-473. Tried by a jury in 2013, Petitioner was found guilty of first-degree murder (Counts 1 and 2) and assault and battery with a dangerous weapon (Count 3). Petitioner received a 10-year sentence for Count 3 and was sentenced to death for Counts 1 and 2. In support of the death sentence, the jury found two aggravating circumstances: (1) Petitioner knowingly created a great risk of death to more than one person and (2) the murders were especially heinous, atrocious, or cruel. Criminal Appeal Original Record vol. 5 at 873-83.[1]

Petitioner appealed his convictions and sentences to the Oklahoma Court of

---

[1] The jury rejected the State's allegation that Petitioner was a continuing threat. Criminal Appeal Original Record vol. 5 at 874, 879.

Criminal Appeals ("OCCA").  The OCCA affirmed in a published opinion.  *Martinez v. State*, 371 P.3d 1100 (Okla. Crim. App. 2016), *cert. denied*, 137 S.Ct. 386 (2016).  Petitioner also filed two applications for post-conviction relief, both of which were denied by the OCCA in unpublished opinions.  *Martinez v. State*, PCD-2017-951 (Okla. Crim. App. Oct. 17, 2017); *Martinez v. State*, PCD-2013-936 (Okla. Crim. App. May 5, 2016).

Petitioner presents seven grounds for relief.  Respondent has responded to the petition [Doc. No. 25] and Petitioner has replied [Doc. No. 28].  The Court allowed supplemental briefing related to Petitioner's first ground for relief [Doc. Nos. 33 and 37].  Petitioner also filed motions for discovery and an evidentiary hearing to which responses and replies were filed [Doc. Nos. 17, 21, 22, 29, 30, and 36].  The Court granted in part Petitioner's motions for discovery and evidentiary hearing, and denied Respondent's motion for reconsideration and motion for certification for interlocutory appeal.  [Doc. Nos. 38 and 47]; *see also* [Doc. Nos. 40, 41, 44, 45, 46].

After a thorough review of the entire state court record (which Respondent has provided), the pleadings and materials submitted in this case, the matters presented at the evidentiary hearing, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to the requested relief.

## I.      Facts

In adjudicating Petitioner's first direct appeal, the OCCA set forth a summary of the facts.  Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct."  Although this presumption may be rebutted, the Court finds that Petitioner has not done so and that, in any event, the OCCA's statement

2

of the facts is an accurate recitation of the presented evidence.  Thus, as determined by the

OCCA, the facts are as follows:

> Carl and Martha "Faye" Miller lived five miles south of Cache, Oklahoma, on State Highway 115 and Woodlawn Road.  Around 4:49 a.m. on Monday, October 12, 2009, Ms. Miller called 911 to report shots being fired from a vehicle parked near her residence.  She could only describe the vehicle as having its lights on.  Ms. Miller asked police to come quickly, saying that "We opened the garage door, and they saw me standing there with the telephone."  Two officers were dispatched to the scene.
>
> A short time later, another motorist also called 911 to report an abandoned vehicle facing east in the westbound lane of Woodlawn Road at the intersection of Highway 115.  The two deputies soon arrived and found the reported vehicle, with no one inside.  The keys were still in the vehicle's ignition and its cabin lights were on.  After seeing loose rounds of high-powered ammunition inside, the deputies turned off their vehicle lights and got a shotgun, an assault rifle, and night vision equipment.
>
> As the deputies scanned the area, they received a third dispatch, to a burglary in progress at a house just across Highway 115, a few hundred feet from the abandoned vehicle.  As they approached the house, deputies heard a struggle.  They knocked at the back door and demanded entry.  Just before they broke in, Shawn Monk unlatched and opened the door.  The deputies found Shawn Monk and [Petitioner] inside and quickly detained them.
>
> The kitchen floor where the two men had been fighting was slick with a mixture of blood and water, which was pouring from a broken refrigerator line.  Shawn Monk was badly injured with bleeding wounds to his head. [Petitioner] repeatedly said "I'm sorry," and eventually told the officers that Monk lived at the house.  The officers also saw a Winchester .30-30 rifle lying on the kitchen floor.  Monk told the deputies the rifle belonged to [Petitioner].  Monk also told the deputies that his parents were injured and needed help.
>
> Shawn Monk later testified at trial that he had spent Sunday night with his parents, Carl and Faye Miller, and slept in a guest bedroom.  He awoke early the following morning to loud noises and voices.  He first thought his father might have fallen asleep with the television on.  He heard a loud, unfamiliar voice say "Where's the money, bitch?"  A short time later, he heard a voice say "You like my dick in your ass, don't you?"  Monk was now alarmed and got up.  The lights in the hallway were turned on.  He screamed down the hallway, "What the fuck is going on?"

Monk then saw a stranger step into the hallway from his parents' bedroom and walk away from him toward the living room area. He followed the intruder, pausing at his parents' bedroom long enough to see his mother lying on the bed, face down, her pants around her ankles, still breathing but obviously injured. [Petitioner] was looking in the garage as Mr. Monk stepped into the living room. [Petitioner] attacked him. As [Petitioner] and Monk fought, Monk pleaded with [Petitioner] to let him get help for his parents.

[Petitioner] eventually relented and sat down in the floor, saying "I fucked up, I'm sorry. My friends fucked him up," referring to Carl Miller. Shawn Monk looked in the garage and saw his father lying on the floor, still breathing but also obviously injured. Monk also picked up the .30-30 lever action rifle he saw lying on the floor, determined it was unloaded, and called 911. [Petitioner] sat in the floor for a few minutes, then got up and threw a barbell at Shawn Monk, striking the phone he was using to call 911. [Petitioner] then wrestled the rifle from Mr. Monk and gashed his head with several blows from the butt of the rifle. Mr. Monk was still fighting with [Petitioner] when he opened the door and deputies entered the home.

Emergency responders transported Carl and Faye Miller to local hospitals, where both later died of their injuries. Faye Miller suffered extensive bruising to her face and upper body, arms, inner thighs, and legs. Blunt force head trauma caused bleeding and bruising to her scalp, a subarachnoid hemorrhage, and a large subdural hematoma with midline shift of the brain. She also sustained traumatic injuries to her vagina and anus consistent with forcible sexual assault. Carl Miller's wounds included blunt force head trauma with several scalp lacerations, a 7 cm. skull fracture, subarachnoid hemorrhage, and contusion of the temporal lobe. Mr. Miller also suffered bruising and scraping of his arms.

[Petitioner's] father testified that [Petitioner] borrowed his .30-30 Winchester rifle and a box of ammunition and left to go hog hunting early in the morning of October 12, 2009. He learned a few days later that [Petitioner] had been arrested. When [Petitioner] was searched at the crime scene, the deputies recovered Carl Miller's wallet and a set of keys belonging to Shawn Monk. They also recovered [Petitioner's] sweatshirt and t-shirt in the Millers' bedroom. [Petitioner's] jeans were stained with blood, which was eventually matched to all three victims by DNA comparisons. Carl Miller's blood was found on [Petitioner's] shoe.

[Petitioner] did not testify at trial. In his first written and taped statements to police on the morning of his arrest, he claimed that a friend named D.J. attacked the victims. Police later identified "D.J." and confirmed his alibi

for the morning of the crimes.  In a second interview several days after the crimes, [Petitioner] then told investigators the murders were committed by a hitchhiker.

At trial, defense counsel acknowledged that [Petitioner] had killed the victims, but argued that the unplanned nature of the crimes and [Petitioner's] intoxication created a reasonable doubt of the element of malice aforethought.

*Martinez*, 371 P.3d at 1106-07.

## II.      Standard of Review

### A.      Exhaustion as a Preliminary Consideration

The exhaustion doctrine is a matter of comity.  It requires the Court to consider in the first instance whether the petitioner has presented his grounds for relief to the OCCA. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights.").  The doctrine is codified in 28 U.S.C. § 2254(b)(1), which provides that, aside from two narrow exceptions, habeas relief shall not be granted unless the remedies available in state court have been exhausted.  Habeas relief may, however, be denied notwithstanding the failure of the petitioner to exhaust state court remedies.  28 U.S.C. § 2254(b)(2).

### B.      Procedural Bar

In addition to the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting

*Coleman*, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

### C.     Limited Merits Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes the Court's review of claims that were adjudicated on the merits in state court proceedings.  28 U.S.C. § 2254; *see also Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011).  Where the state court adjudicated a claim on the merits, this Court may reach the merits of the claim only if the petitioner can establish that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. at § 2254(d)(2).

Clearly established federal law under § 2254(d)(1) refers to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A decision is "contrary to" clearly established federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13.  A decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id.* at 413.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Rather, the factual determination must be "objectively unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Further, § 2254(d)(2) only permits relief where the state court decision was "based on" the unreasonable factual determination. *Smith v. Aldridge,* 904 F.3d 874, 880 (10th Cir. 2018).

In sum, the "question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Habeas relief is warranted only where there is no "possibility for fairminded disagreement" with the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011); *see also Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  This standard was meant to be difficult to meet, and "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted).  When reviewing a claim under § 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.    Analysis

### A.    Ground One: Impermissible Influence on the Jury

Petitioner's first ground for relief is that he was prejudiced during second-stage

deliberations by the jury's consideration of impermissible non-record evidence. Specifically, Petitioner asserts the jury consulted a Bible during sentencing deliberations. Petitioner did not present this argument in either his direct appeal or his first post-conviction application. Petitioner did present the argument to the OCCA in a second post-conviction application, but the OCCA concluded it was procedurally barred. *Martinez*, PCD-2017-951, slip op. at 5. The Court held an evidentiary hearing to determine whether Petitioner could establish cause and prejudice sufficient to overcome the procedural bar such that the Court could properly consider the merits of Petitioner's claim. [Doc. Nos. 82, 85, 89, and 90]; *see Coleman*, 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law . . . .").

In considering the evidence presented at the hearing and in the record as a whole, the Court is mindful that, generally on a habeas petition, the petitioner bears the burden of proving by a preponderance of the evidence that there has been a violation of his constitutional rights. *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938) (applying the preponderance of the evidence standard to constitutional claims raised on federal habeas). Here, Petitioner's burden included the threshold inquiry of whether there was actually a Bible in the jury deliberation room.[2] Petitioner presented some evidence

---

[2] In his Proposed Findings of Fact and Conclusions of Law, Petitioner argues that the impermissible extrinsic evidence was "[r]eligion and morality, God and the Bible." [Doc.

indicating there was perhaps a possibility of such an external influence, but such evidence was controverted by other evidence indicating there was no Bible in the room.

For instance, Petitioner presented evidence from one juror who, in 2017, stated there was a Bible in the jury deliberation room. Both in 2019 and at the hearing, however, that same juror stated he could not remember whether there was a Bible in the room. At the hearing, he also could not confirm that his 2017 statement was accurate. A second juror also stated in 2017 that he recalled a Bible in the jury deliberation room, but then in 2019 stated he did not remember whether there was a Bible in the jury room. And while the bailiff thought she might have heard a juror reading from the Bible during deliberations, her deposition testimony made clear she thought it equally likely she was hearing someone quote scripture from memory. Additionally, though the parties stipulated that a third juror would testify she thinks there was a Bible in the jury room, the remainder of the jurors did not remember a Bible, did not think there was a Bible, or definitively stated there was no Bible.

Petitioner thus failed to establish it was more likely than not that a Bible was in the jury deliberation room and, as such, failed to meet his burden. Accordingly, a determination of cause and prejudice is unnecessary and Petitioner is not entitled to relief on Ground One.

---

No. 89] at 22. But the question before the Court is whether the jury improperly consulted a Bible, *see* Petition at 24-31, not whether the jury discussed scripture, religion, morality, or God.

**B.**     **Ground Two: Ineffective Assistance of Counsel**

Petitioner raises two ineffective assistance of appellate counsel claims, both with respect to trial counsel's presentation of mitigation factors, and both premised on appellate counsel's failure to include specific trial counsel ineffectiveness claims on direct appeal. First, Petitioner argues that appellate counsel should have challenged trial counsel's decision not to call or question three of Petitioner's family members in his trial's penalty stage.   Second, he claims appellate counsel should have challenged trial counsel's mitigation investigation and presentation.   The Court finds that neither claim warrants relief.

*1.*     *Clearly Established Law*

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must show both that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, courts must apply the highly deferential standards of *Strickland* and AEDPA to the facts of the case and decide whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.  A state court's ruling cannot be disturbed unless the petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fair-minded jurist would agree was incorrect.  *Id*.

Regarding deficient performance, the Supreme Court has shunned "specific guidelines" and instead held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

10

Of course, whether an attorney's conduct is reasonable will depend on the facts of the particular case. *Id.* To avoid the "distorting effects of hindsight," an attorney's conduct should be judged "from counsel's perspective at the time." *Id.* at 689-90. In light of the extremely important role that mitigating evidence plays in the "just imposition of the death penalty," this Court is required to apply careful scrutiny when reviewing the performance of counsel at the sentencing stage. *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). But even when applying such scrutiny, review of an attorney's performance remains a highly deferential one, where "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Mayes*, 210 F.3d at 1288.

In addition to deficient performance, the petitioner must also show prejudice. Prejudice exists where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In Oklahoma, where the jury can only impose a death sentence unanimously, the question is whether there is a reasonable probability that at least one juror would have concluded that "'the balance of aggravating and mitigating circumstances did not warrant death.'" *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695).

    2.   *Analysis*

        a.   Failure to properly utilize family members in mitigation

           i.   Deficient performance

Petitioner argues that his trial counsel performed deficiently in failing to develop

and present testimony from his biological mother, grandfather, and uncle[3] during the penalty stage and that his appellate counsel was constitutionally ineffective in failing to raise this issue on direct appeal.  He asserts that it was unreasonable under prevailing professional norms to not present testimony from his mother, grandfather, and uncle, whom he describes as having "the longest and most complex relationships with [him] of any potential witness."  Petition at 28.  Addressing the merits of the claim,[4] the OCCA concluded that the "overall penalty phase defense was reasonably balanced and consistent with prevailing professional norms."  *Martinez*, PCD-2013-936, slip op. at 11.  This conclusion is not an unreasonable one.

To begin with, Petitioner's grandfather, Luis "Marty" Martinez, and mother, Roberta Lopez, posed significant risks for the defense.  For example, Marty Martinez, who testified for the State during both stages of the trial, indicated that he was not aware of Petitioner having a drinking problem, which directly undercut the defense's attempt to show that Petitioner was a chronic alcoholic.  Transcript of Jury Trial ("Trial Tr.") vol. VI at 204-05.  In discussions with the trial investigator, Marty Martinez also suggested that Mr. Monk, one of the victims, was involved in the murders.  Original App. For Post-Conviction Relief at Att. 4, *Martinez*, PCD-2013-936.  These facts could very reasonably

---

[3] Petitioner was adopted by his maternal grandparents.  For ease of reference, the Court refers to his family members by their biological relationship.

[4] Petitioner argues this claim is not entitled to deference under AEDPA because "OCCA's cursory treatment does not constitute an adjudication."  Petition at 27.  The Court disagrees. The OCCA thoroughly analyzed Petitioner's claim under the first prong of the *Strickland* standard and denied Petitioner an evidentiary hearing, which decision was not unreasonable.

lead trial counsel to conclude that Marty Martinez would be more harmful than helpful as a mitigation witness.  This conclusion is bolstered by the affidavit of trial counsel's investigator stating that it was his understanding that the trial attorneys did not call Marty Martinez as a mitigation witness "based on strategy."[5]  *Id*.  Testimony from Ms. Lopez posed similar risks to the defense.  While she may have been able to provide insight into her decision to abandon Petitioner and the impact it had on him when he discovered the truth, her history of mental instability and drug use also made her a less reliable witness.  Trial Tr. vol. XI at 35-36.  Further, the value of Ms. Lopez's testimony regarding the Martinez household is limited given that she was not present during Petitioner's childhood and could therefore not testify to how he was raised.  *Id*.

As to Petitioner's uncle, Richard Martinez, his proposed testimony, like that of Petitioner's mother and grandfather, is largely cumulative of testimony provided by other witnesses.  While the original trial team contacted Richard Martinez and anticipated calling him as witness, he was subsequently deployed to Afghanistan, where he remained throughout the trial.  Original App. For Post-Conviction Relief at Att. 5.  Given the limited benefit of his testimony and the challenges inherent in securing his testimony while deployed, trial counsel's decision to forego calling him as a mitigation witness was not unreasonable.

In support of his ineffectiveness claim, Petitioner argues that the decision to not call

---

[5] The Court disagrees with Petitioner's claim that the OCCA mischaracterized the investigator's affidavit.

these witnesses was not the result of an informed, fully investigated strategy and makes much of the fact that multiple attorneys were assigned to the case throughout the course of the litigation.  While numerous changes in counsel is not ideal, there is no reason to think the trial team did not review the case file or memoranda that were prepared for prior counsel.  The mere fact that the trial team did not consist of the same attorneys as were originally assigned is not enough to show Petitioner received ineffective assistance of counsel.

An attorney "does not act unreasonably in failing to call every conceivable witness that might testify on a defendant's behalf." *Hooks v. Workman*, 689 F.3d 1148, 1190 (10th Cir. 2012).  Here, counsel's investigator interviewed Marty Martinez and Roberta Lopez, and was aware of Richard Martinez, but counsel elected not to call them as witnesses during the penalty phase of the trial.  Given that trial counsel could have legitimately viewed testimony from these witnesses as duplicative, unhelpful, or fraught with risk, the decision not to call these witnesses was not unreasonable.  Accordingly, it was not unreasonable for the OCCA to conclude under the first prong of the *Strickland* standard that Petitioner's counsel was not deficient.

### ii.    Prejudice

As Petitioner is unable to establish the first prong of the *Strickland* standard, it is unnecessary to consider the second prong.  *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.").

But even if the Court were to examine this prong *de novo*,[6] and assuming that trial counsel did act unreasonably by not calling these witnesses, there is no reasonable probability that the jury would have opted for a life sentence over death if the witnesses had testified.  The vast majority of the information these witnesses would have provided was already presented to the jury via other witnesses.  *See Strickland*, 466 U.S. at 699-700 (noting lack of prejudice where omitted evidence "would barely have altered the sentencing profile presented to the sentencing judge"); *Pinholster*, 563 U.S. at 200 (noting lack of prejudice where "'new' evidence largely duplicated the mitigation evidence at trial"); *Matthews v. Workman*, 577 F.3d 1175, 1192-93 (10th Cir. 2009) (finding lack of prejudice where witnesses' testimony "would have been largely cumulative of evidence the jury did hear").

During the penalty phase, the State focused on the heinous nature of the crimes and presented a strong aggravating case.  In response, Petitioner called a mitigation expert and six lay witnesses, including family members.  Trial Tr. vol. XI at 14-117.  The jury heard detailed testimony about Petitioner's mental health, social history, family dynamics, exposure to sexual abuse, good conduct while incarcerated, and positive attributes.  *Id*. Petitioner argues that his mitigation defense was prejudiced because the three witnesses he identifies could have provided additional testimony regarding Ms. Lopez's decision to

---

[6] Because the OCCA found Petitioner's counsel's representation to be adequate and, thus, did not reach the issue of prejudice, AEDPA's deferential standards would not apply and the Court would review this element of the claim *de novo*.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

abandon her son, the effect this secret had on Petitioner, what it was like raising Petitioner, and Petitioner's lifelong struggle with depression and alcoholism.  But the jury heard specific testimony about all these topics through expert and lay witnesses.  Trial Tr. vol. XI at 24-42, 97-109.  There is no indication that the witnesses Petitioner identifies could have given details that would have added significant persuasive value to the mitigation evidence, particularly given that Ms. Lopez and Richard Martinez were not consistently present during Petitioner's upbringing.  At best, Petitioner can only argue that direct testimony from these witnesses would be more persuasive than hearing the facts from the mitigation expert or other sources.  That speculative proposition is not sufficient to show prejudice.

iii.    Conclusion

The OCCA's finding that trial counsel was not constitutionally ineffective and that appellate counsel was not constitutionally ineffective for omitting the trial counsel claim was reasonable.  Petitioner is not entitled to relief regarding counsel's failure to further develop this evidence or call these witnesses during sentencing.

b.    Failure to adequately investigate background and present a more thorough mitigation case.

Petitioner's second appellate ineffectiveness claim includes arguments relating to trial counsel's failure to adequately investigate and prepare a reasonable mitigation strategy, as well as appellate counsel's and post-conviction counsel's failures to challenge trial counsel's investigation, overall presentation of the mitigation case, and use of the

16

mitigation expert.[7]   Petitioner did not raise this claim in state court until the second application for post-conviction relief.   The OCCA applied Oklahoma's procedural bar to the portions of the claim related to trial counsel and direct appeal counsel, finding they could have been raised in prior proceedings.   *Martinez*, PCD-2017-951, slip op. at 5. Respondent argues that this claim is procedurally barred.   Petitioner offers no response to this argument nor does he allege any cause for excusing the bar.   The Court will therefore enforce Oklahoma's procedural bar as to the portions of the claim that the OCCA found to be procedurally barred.   *See Coleman*, 501 U.S. at 750.

The OCCA did not apply a procedural bar to the portion of Petitioner's claim related to his original post-conviction counsel, but instead addressed the merits of Petitioner's statutory right to post-conviction counsel.   *Martinez*, PCD-2017-951, slip op. at 6 & n.2 (citing Okla. Stat. tit. 22, § 1089(B)).[8]   Petitioner, however, has "no constitutional right to an attorney in state post-conviction proceedings," and therefore "cannot claim constitutionally ineffective assistance of counsel in such proceedings."   *Coleman*, 501 U.S. at 752.   As such, Petitioner's argument before this Court asserting constitutionally

---

[7]This claim encompasses many different arguments related to trial counsel's failures during the sentencing phase.   None of these arguments were raised in the state court until Petitioner's second post-conviction application.   Additionally, Petitioner does not develop specific arguments as to ineffective assistance of his post-conviction counsel, but because the caption for this section of his brief references "Post-Conviction Counsel," the Court addresses Petitioner's arguments about "appellate counsel" as including both direct appeal and post-conviction counsel.   *See* Petition at 33, 46.

[8] Addressing the merits of Petitioner's statutory claim, the OCCA determined Petitioner had shown neither deficient performance nor prejudice.   *Martinez*, PCD-2017-951, slip op. at 7.

ineffective assistance of post-conviction counsel lacks merit.

### 3.   Conclusion

The OCCA's decision regarding Petitioner's first claim of ineffective assistance of counsel was reasonable, and Petitioner's second claim of ineffective assistance is either procedurally barred or without merit.  Accordingly, Petitioner is not entitled to relief on Ground Two.

### C.   Ground Three: Prosecutorial Misconduct

In his third ground for relief, Petitioner argues that he was deprived a fair sentencing proceeding as a result of a comment made by the prosecutor during the final penalty stage closing argument.  During the penalty stage, Petitioner called his two sons to testify on his behalf and defense counsel highlighted their testimony in his closing argument.  During his rebuttal closing argument, the Prosecutor made the following remarks:

> Putting those children on the stand yesterday, what a situation to put those children into.  Why would you do that?  Well, you know why you would do that, to play on your emotions.

Trial Tr. vol. XII at 16.

Petitioner challenged this comment on direct appeal, arguing that it improperly denigrated defense counsel and invited the jury to punish Petitioner for presenting his children as witnesses.  The OCCA denied relief, finding that the prosecutor's comments "urged the jury to avoid a purely emotional reaction to the mitigation evidence, and did not exceed the bounds of proper argument."  *Martinez*, 371 P.3d at 1114.  Applying AEDPA's deferential standard, the Court concludes that the OCCA's decision was not unreasonable.

### 1.    *Clearly Established Law*

Prosecutors can litigate with earnestness and vigor and are allowed to strike hard blows. *Berger v. United States*, 295 U.S. 78, 88 (1935).  But prosecutors may not strike foul blows. *Id*.  The line between hard and foul is an uncertain one, and even the Supreme Court has admitted that "there is often a gray zone." *United States v. Young*, 470 U.S. 1, 7 (1985).  To resolve prosecutorial misconduct claims, courts must first determine whether misconduct even occurred.

If a prosecutor engaged in misconduct that deprived the petitioner of a specific constitutional right, habeas relief is only warranted if the error had a substantial and injurious effect in determining the jury's verdict.  *Matthews*, 577 F.3d at 1186 (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)).  Alternatively, if the misconduct does not implicate a specific constitutional right, it ordinarily warrants relief only when the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 645 (1974)).  This analysis considers the trial as a whole, and factors in the strength of the evidence, cautionary steps to counteract improper remarks, and defense counsel's failure to object. *Id.*  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  Rather, the question is whether the petitioner was deprived of a fair trial or sentencing. *Id.*

### 2.    *Analysis*

The specific statement Petitioner complains of came in the context of the prosecutor

19

arguing that the heinous nature of the crimes should carry more weight than any sympathy the jurors may have for the victims or their family members:

> I'd also like to remind you that Carl Miller is a father.  He's a dad, he's a daddy.  Faye Miller, she's a mother, grandmother, grandfather [sic].  Putting those children on the stand yesterday, what a situation to put those children into.  Why would you do that?  Well, you know why you would do that, to play on your emotions.  I don't want you to feel sorry for Carl, Faye.  This ain't a place to feel sorry for them.  This is where justice happens.  This is about justice.  It's about crimes, ugly crimes, ugly horrible, terrible crimes cause by this man.

Trial Tr. vol. XII at 16.

So long as the jury is properly instructed, a prosecutor is free to comment on the weight the jury should accord to mitigating evidence.  *Bland v. Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006).  Here, read in context, the prosecutor's comments can reasonably be interpreted as asking the jury to accord less weight to the emotional testimony heard during the penalty stage and more weight to the other evidence presented.  Contrary to Petitioner's characterization, the prosecutor's comment did not improperly attack Petitioner or defense counsel, but instead asked the jury to not be swayed by sympathy for the victims, their families, or Petitioner's children.  Given that "[i]t is of vital importance . . . that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," *Gardner v. Florida*, 430 U.S. 349, 358 (1977), a prosecutor's argument seeking to downplay emotional mitigation evidence is not improper, and certainly not enough to render the sentencing fundamentally unfair.

Further, "when a prosecutor is responding to defense counsel's argument, courts 'must also take into account defense counsel's opening salvo.'"  *Matthews*, 577 F.3d at

1189 (quoting *Young,* 470 U.S. at 12).  The statement Petitioner objects to was made immediately after defense counsel's closing argument, which highlighted the testimony of Petitioner's children.  Trial Tr. vol. XII at 14-15.  Given that context, the OCCA was reasonable to conclude the remark was proper.

In addition to claiming a general due process violation, Petitioner also argues that the prosecutor's comment deprived him of a specific constitutional right by infringing his right to present mitigating evidence.  But the prosecutor did not prevent any mitigating evidence from being presented or considered by the jury.  Instead, as previously noted, the prosecutor merely attempted to minimize the weight to be accorded to the emotional evidence presented by Petitioner's sons.  *See Bland,* 459 F.3d at 1026 (rejecting prosecutorial misconduct claim because "[t]he prosecutors, while critical of [the petitioner's] mitigating evidence, never told the jury it could not consider [the petitioner's] mitigating evidence").  Unlike the cases relied on by Petitioner, the jury in this case was able to hear the evidence and was not instructed to disregard it.  Thus, there is no basis to conclude that Petitioner's right to present mitigating evidence or have it considered by the jury was infringed.

### 3.   Conclusion

The OCCA's conclusion regarding the prosecutor's comment was not unreasonable.  Accordingly, Petitioner is not entitled to relief on Ground Three.

### D.   Ground Four: Inflammatory Witness Testimony

Petitioner's fourth ground asserts that the introduction of an irrelevant and inflammatory racial epithet during the penalty stage deprived him of a fair and reliable

sentencing in violation of the Eighth and Fourteenth Amendments. This ground is based on the testimony of his former girlfriend, Mary Carothers, who testified for the prosecution during the penalty phase. *See* Trial Tr. vol. X at 44-55. Prior to her testimony, defense counsel warned the prosecutor that Ms. Carothers hated Petitioner and could be an unpredictable witness. *Id.* at 88-89. The prosecution opted to call her anyway, presumably to provide evidence in support of the continuing threat aggravator. Ms. Carothers testified that Petitioner had been violent with her during their relationship, *id.* at 49, and described a fight Petitioner engaged in with two men in a parking lot. *Id.* at 51-53. Ms. Carothers testified that when she asked Petitioner why he was fighting with the men, he responded "[t]hose two n*****s said they were going to rape you." *Id.* at 53.

Petitioner immediately moved for a mistrial after this comment. *Id.* at 53. During their argument at the bench, the prosecutor disclaimed any knowledge that Ms. Carothers was going to use the racial slur. *Id.* at 54. Defense counsel agreed that he did not believe the prosecutor knew what Ms. Carothers was going to say. *Id.* at 88-89. The trial court overruled the motion for mistrial and instructed the jury to disregard the statement. *Id.* at 54.

On direct appeal, Petitioner argued that Ms. Carothers' statement violated his First, Eighth, and Fourteenth Amendment rights. The OCCA denied relief, finding that Petitioner's First Amendment rights were not violated and that "the evidentiary error, if any, was cured by the trial court's instruction." *Martinez*, 371 P.3d at 1115. Petitioner now argues that the prosecutor, the trial court, and the OCCA violated his Eighth and Fourteenth Amendment rights to due process and a fair sentencing by allowing the

introduction of the inflammatory racial epithet.

Initially, the parties dispute whether AEDPA deference applies to this claim. Petitioner argues that the OCCA did not adjudicate his Eighth Amendment claim because the opinion does not mention the Eighth Amendment or cite to any cases discussing the need for heightened reliability in capital sentencing. Respondent counters that Petitioner's limited argument on this issue did not merit extensive discussion by the appellate court and that the claim was not overlooked because the OCCA expressly recognized the claim at the beginning of its discussion.

"[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (internal quotation marks omitted). This presumption is a strong one that "may be rebutted only in unusual circumstances." *Id.* at 302. Further, the presumption applies even where "a state-court opinion addresses some but not all of defendant's claims," *id.* at 298, or where the state court "fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

Petitioner cannot overcome the strong presumption that the OCCA adjudicated his Eighth Amendment claim on the merits. At the beginning of its discussion, the OCCA specifically recognized the basis for the Eighth Amendment claim when it summarized Petitioner's argument as including an assertion that he was denied a fair sentencing proceeding. *Martinez,* 371 P.3d at 1114. Thus, it does not appear that the claim was "rejected as a result of sheer inadvertence." *Johnson*, 568 U.S. at 302-03. The more

plausible explanation is that, having rejected Petitioner's other arguments and concluded that any evidentiary error was cured, the OCCA "simply regard[ed] [the Eighth Amendment claim] as too insubstantial to merit discussion." *Id.* at 299.   As the claims asserted in Petitioner's fourth ground for relief were adjudicated on the merits, the OCCA's decision is entitled to deference under AEDPA.   However, this issue is largely an academic one, because even under *de novo* review, Petitioner is not entitled to relief on Ground Four.

### 1.    Clearly Established Law

Petitioner argues that his Eighth Amendment right to a fair sentencing proceeding and his Fourteenth Amendment right to due process were violated by the introduction of Ms. Carothers' testimony during the penalty phase.   Petitioner briefly cites to *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Woodson v. North Carolina*, 428 U.S. 280 (1976), for the general proposition that the Eighth and Fourteenth Amendments demand a higher degree of reliability in capital cases.   *Caldwell* involved a prosecutor's remarks and held that the jury must not be misled regarding its role in the sentencing decision.   472 U.S. at 328-29.   *Woodson* struck down a state's mandatory death penalty scheme.   428 U.S. at 301. Neither of these cases resemble the issue here – the introduction of inflammatory evidence – and Petitioner does not explain how any clearly established Supreme Court precedent supports finding an Eighth Amendment violation based on a witness' inflammatory remark, other than generally arguing that he was denied a fair sentencing proceeding.

Ordinarily, claims regarding prejudicial evidence arise under the Due Process Clause.   In *Darden v. Wainwright*, 477 U.S. 168, the petitioner claimed that portions of the prosecutor's closing argument "rendered his conviction fundamentally unfair and deprived

the sentencing determination of the reliability that the Eighth Amendment requires." *Id.* at 178-79.   After placing the remarks in context, the Supreme Court explained that the appropriate standard of review for the claim was "the narrow one of due process" and proceeded to analyze whether the remarks rendered the trial "fundamentally unfair." *Id.* at 181, 183 (internal quotation marks omitted);[9] *see also Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.").

Accordingly, this Court must determine whether Ms. Carothers' testimony rendered the sentencing proceeding fundamentally unfair.   Petitioner argues that in making this determination, the Court must find unfairness because "'the probative value of the challenged evidence is greatly outweighed by the prejudice flowing from its admission.'" *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006), *overruled on other grounds by Wilson v. Workman*, 577 F.3d 128 (10th Cir. 2009), (quoting *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (alterations incorporated)).   But the cases Petitioner relies on for that specific proposition concern the admission of prior crimes or wrongs, *see Welch*,

---

[9] The Supreme Court also specifically rejected the petitioner's claim that the prosecutor's comments violated the Eighth Amendment's requirement of reliability in the sentencing process that was articulated in *Caldwell. Darden*, 477 U.S. at 183 n.15.   The Court explained that *Caldwell* is only relevant to comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Id.*   The interjection of a racial slur by a lay witness is not the type of comment that would mislead the jury regarding its role in the sentencing process. Therefore, Petitioner's reliance on *Caldwell* is misplaced.

451 F.3d at 687-88, *Knighton*, 293 F.3d at 1171, or improper statements by the prosecutor, *see Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (citing *Hopkinson v. Shillinger*, 866 F.2d 1185, 1210 (10th Cir. 1989)).  Here, the claim is not based on the allegedly erroneous admission of evidence of a prior crime or an alleged improper remark by the prosecutor.  Instead, the claim turns on an inflammatory remark made by a lay witness that arose in the context of probative testimony on a disputed issue.  Thus, the relevant inquiry is simply whether the witness remark was "so prejudicial in the context of the proceedings as a whole that [the petitioner] was deprived of the fundamental fairness essential to the concept of due process." *Nichols v. Sullivan*, 867 F.2d 1250, 1253 (10th Cir. 1989).  The introduction of evidence that "may have been irrelevant as a matter of state law . . . does not render its admission federal constitutional error." *Romano v. Oklahoma*, 512 U.S. 1, 10 (1994).  Inflammatory or prejudicial remarks by witnesses generally do not violate due process if the comments are unsolicited and the trial judge instructs the jury to disregard the remarks.  *See Nichols*, 867 F.2d at 1253-54; *Scrivner v. Tansy*, 68 F.3d 1234, 1240 (10th Cir. 1995); *Fero*, 39 F.3d at 1474-75.

>            2.    *Analysis*

Ms. Carothers' testimony, where she attributed a racial slur to Petitioner, did not render the sentencing fundamentally unfair or unreliable.  First, while the prosecutor was warned that Ms. Carothers may be a problematic witness, the remark was neither solicited nor expected.  The prosecutor denied knowing that Ms. Carothers would use a racial epithet and both defense counsel and the trial judge agreed that the prosecutor did not anticipate that specific testimony.  Trial Tr. vol. X at 88.  Further, there is nothing suspect about the

prosecutor's line of questioning with Ms. Carothers, where he appears to simply be trying to elicit details regarding the altercation, including the age of the people involved, whether Petitioner had been using alcohol, and the length of the fight. *Id.* at 51-53.

Second, the trial judge immediately instructed the jury to disregard Ms. Carothers' remark. *See Nichols*, 867 F.2d at 1254 (finding cautionary instruction following prejudicial witness remark "would have cured any possible prejudice complained of here"). Jurors are presumed to follow the court's instructions, *Taylor v. Workman*, 554 F.3d 879, 893 (10th Cir. 2009), and Petitioner does not offer any evidence to overcome this presumption. On the contrary, the jury's rejection of the continuing threat aggravator, the only aggravator that Ms. Carothers' testimony was relevant to, suggests that the jury heeded the court's instruction and dispassionately weighed the evidence.

### 3.    Conclusion

To be sure, the racial epithet itself lacked probative value and was prejudicial. But the fact that the remarks were inflammatory does not in and of itself create a constitutional violation. *See Payne*, 501 U.S. at 831 (O'Connor, J., concurring) (recognizing that when inflammatory evidence is improperly admitted, the courts must determine whether the error caused prejudice). The remark was unexpected, brief, and the jury was immediately instructed to disregard it. In the context of the entire proceeding, the Court is not persuaded that the testimony complained of was so prejudicial that it denied Petitioner a fair sentencing. Petitioner is not entitled to relief on Ground Four.

### E.    Ground Five: Prejudicial Photographs

In Ground Five, Petitioner claims that six photographs of the victims' injuries were

unduly prejudicial and their admission at trial violated his due process rights.[10]   The photographs depict the injuries to Mr. Monk and post-mortem images of the injuries to Mr. Miller's head, Ms. Miller's face, and Ms. Miller's genitals.   Petitioner asserts that these photographs were cumulative to other evidence admitted during the first stage and needlessly gruesome.  He further asserts that the photographs introduced during the second stage were irrelevant to the heinous, atrocious, and cruel aggravator and that any probative value was substantially outweighed by their prejudicial effect.

Petitioner objected to the photographs at trial and challenged their admission on direct appeal on the grounds that they were cumulative and unduly prejudicial in violation of his due process rights.  The OCCA rejected the claim, finding that the photographs were "probative of the disputed issue of Appellant's intent to kill the victims, corroborative of other lay and expert testimony, and germane to the issues of guilt and punishment." *Martinez*, 371 P.3d at 1113.  Mindful of AEDPA's constraints, the Court finds that the OCCA's decision was not contrary to or an unreasonable application of clearly established federal law.

### 1.   *Procedural Bar*

Before bringing a habeas action, petitioners must exhaust their claims by "fairly presenting" them in state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1)(A).   The petitioner need not provide "'book and verse on the federal

---

[10] Petitioner also claims the admission of the photographs violated his Eighth Amendment right to a reliable sentencing, but generally frames his claim as a due process violation.  In any event, as discussed in section D, the Fourteenth Amendment's Due Process clause provides the appropriate standard.

constitution,'" but he must go beyond simply presenting the facts supporting the federal claim or articulating a "'somewhat similar state-law claim.'"  *Bland*, 459 F.3d at 1011 (quoting *Picard*, 404 U.S. at 278 and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  Instead, to satisfy exhaustion, the substance of the federal claim must have been raised in state court.  *Id.*  Generally, federal courts will dismiss unexhausted claims without prejudice and allow the petitioner to raise the claim in state court.  *Id.* at 1012.  But when the state court would find the claim procedurally barred under an independent and adequate procedural rule, "there is a procedural default for purposes of federal habeas review."  *Id.* (internal quotation marks omitted).  Oklahoma defendants cannot apply for post-conviction relief on issues that could have been raised "previously in a timely original application or in a previously considered application . . . ."  Okla. Stat. tit. 22, § 1089(D)(8)(a).

In addition to arguing that the photographs were cumulative and unduly prejudicial, Petitioner now claims that they allowed the jury to impermissibly infer that the heinous, atrocious, or cruel aggravator was met, even though there was no evidence that the injuries were the result of conscious physical suffering.[11]  But this particular argument was never

---

[11] Petitioner would not be entitled to relief even if the court considered the merits of this particular claim.  Petitioner's argument is based on *Spears v. Mullin,* 343 F.3d 1215, 1226-30 (10th Cir. 2003).  In *Spears*, the Tenth Circuit ruled that the admission of six gruesome photographs of the victim's injuries rendered the sentencing fundamentally unfair because the photographs were not probative of conscious physical suffering given the uncontradicted evidence that the victim died or lost consciousness early on in the attack. Here, unlike *Spears*, there was evidence to support a finding that the victims' injuries were sustained while the victims were conscious.  *See Martinez*, 371 P.3d at 1116-17. Additionally, with the exception of Exhibit 93, all of the photographs were admitted during the first stage.  They were not, as was the case in *Spears*, deliberately held back until the second stage for their "shock value" or offered solely for the purpose of showing conscious

presented to the OCCA.

On direct appeal, Petitioner argued only that the photographs were cumulative and that their probative value was outweighed by their prejudicial effect. Appellant's Br. at 25-32, *Martinez v. State*, D-2013-673 (Okla. Crim. App. Aug 5, 2014). Petitioner did not argue that the photographs were improperly admitted to prove conscious physical suffering. In fact, in his direct appeal brief, he concedes that Exhibit 93 "was relevant to the especially heinous, atrocious or cruel aggravating circumstance . . . ." *Id*. at 30. "Because presentation of a 'somewhat similar' claim is insufficient to 'fairly present' a federal claim before the state courts," Petitioner has failed to exhaust this particular claim. *Bland*, 459 F.3d at 1012.

Petitioner could have raised his claim regarding the photographs' relevance in proving conscious physical suffering on direct appeal, but failed to do so. He also provides no response to Respondent's argument that this claim is unexhausted and procedurally barred. Pursuant to Okla. Stat. tit. 22, § 1089(D)(8), Oklahoma law would bar this claim. Accordingly, the Court will consider this particular claim barred for purposes of federal habeas review. Plaintiff's remaining claim – that the photographs were cumulative and unduly prejudicial in violation of due process – was raised in state court and has been exhausted.

## 2. *Clearly Established Law*

Federal habeas review is limited to correcting violations of constitutional rights; it

---

physical suffering. *Spears*, 343 F.3d at 1228. Further, the photographs themselves are not so shocking or gruesome that their probative value is outweighed by their prejudicial effect.

is not available to correct state law evidentiary errors. *Thornburg v. Mullin*, 422 F.3d 1113, 1128-29 (10th Cir. 2005). In evaluating the admission of evidence, the relevant question is whether the evidence so infected the trial with unfairness as to render the resulting conviction or death sentence a denial of due process. *Romano*, 512 U.S. at 12; *see also Payne*, 501 U.S. at 825; *Donnelly*, 416 U.S. at 643. This "'fundamental-fairness analysis is not subject to clearly definable legal elements,'" and courts must therefore "'tread gingerly and exercise considerable self-restraint'" when engaged in this review. *Spears*, 343 F.3d at 1226 (quoting *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002)). Only a narrow category of infractions will violate fundamental fairness. *Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002).

        *3.    Analysis*

        The OCCA did not act contrary to or unreasonably apply clearly established federal law when it concluded that the admission of the photographs was proper. All of the photographs depict injuries inflicted on the victims, and while the wounds are extensive and the images graphic, none are so shocking, gruesome, or grossly prejudicial as to infect the proceedings with unfairness.

        In *Thornburg v. Mullin*, 422 F.3d at 1128-29, the petitioner argued that the admission of six photographs showing the charred remains of the victims' bodies as they were found deprived him of his due process rights. The Tenth Circuit found that the OCCA's rejection of the claim was reasonable and acknowledged the probative value of the images:

> [The petitioner] pleaded not guilty.  Even if he did not dispute the manner of death, the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events.  The photographs corroborated their accounts.

*Id.* at 1129.  Similarly, here, the photographs had probative value as they corroborated the lay and expert testimony regarding the nature and extent of the injuries.  The photographs were also probative of Petitioner's intent to kill.  *See Willingham v. Mullin*, 296 F.3d 917, 928 (10th Cir. 2002) (finding that twenty-two photographs of victim's body were properly admitted for their relevance to critical element of intent to kill).

Petitioner complains that these photographs were unfairly prejudicial because they were cumulative to other evidence and "gratuitously gruesome."  Petition at 75.  The Court disagrees.  First, the photographs were not needlessly cumulative.  Although the medical examiner testified about and diagrammed the injuries, the photographs depict the actual injuries and helped the jury understand the nature and extent of the wounds.  *See Cole v. Trammell*, 755 F.3d 1142, 1165 (10th Cir. 2014) (finding autopsy photographs were relevant for purposes of aiding the jury in understanding the medical examiner's testimony).

Second, while the photographs may be disturbing, they are not so gruesome as to outweigh the probative value of the evidence or render the proceedings unfair.  Exhibit 6 depicts blood covering Mr. Monk's face.  The photograph shows Mr. Monk as the police found him and was admitted along with other photographs depicting the injuries without the blood.  Exhibits 84, 85, 86, and 89 are post-mortem photographs of the injuries to Mr. Miller's head and Ms. Miller's face.  They show bruising, some medical tape and tubes,

32

and wounds that have been closed with staples.  Exhibit 93, which was admitted during the penalty stage, depicts the injuries to Ms. Miller's vagina.  While it is true that the images are graphic and the injuries are extensive, none of these photographs are gratuitously gruesome, particularly in light of their probative value.  At the very least, the OCCA's conclusion in that regard is not unreasonable.  *See, e.g., Smallwood v. Gibson*, 191 F.3d 1257, 1274-75 (10th Cir. 1999) (upholding four photographs of victim's charred corpse given the "probative nature of the photographs, the gruesome character of the crime itself, and the wealth of additional evidence supporting defendant's convictions").

4. *Conclusion*

The OCCA's rejection of Petitioner's arguments regarding the admission of Exhibits 6, 84, 85, 86, 89, and 93 is not contrary to or an unreasonable application of clearly established federal law.  The photographs were probative of issues in the case, assisted the jury in understanding lay and expert testimony, and were not so gruesome as to be unduly prejudicial.  Their admission did not so infect the proceedings with unfairness as to render the conviction or imposition of the death penalty a denial of due process.  Petitioner is not entitled to relief on Ground Five.

**F.    Ground Six: Failure to Perform Timely Blood Draw**

Petitioner's sixth ground for relief challenges the OCCA's finding that the police's failure to collect an earlier blood draw and the prosecution's use of the negative results did not violate due process.  After Petitioner was taken into custody by law enforcement, several officers observed signs that he had been consuming alcohol.  Petitioner also made references to drinking while he was being questioned by investigators.  Around 10:27 a.m.,

approximately five hours after the murders, investigators asked Petitioner to submit to a blood draw. *See* Trial Tr. State's Ex. 38. Petitioner refused. *Id.* The police then obtained a warrant for the blood draw, which was executed at approximately 6:35 p.m. Criminal Appeal Original Record vol. 1 at 8-10; Trial Tr. vol. VII at 73-74; Trial Tr. State's Ex. 70C. The results of the blood test were negative. The State introduced the test results during the guilt stage of the trial. Trial Tr. vol. VII at 92.

On direct appeal, Petitioner argued that his due process rights were violated because (1) the police's failure to collect an earlier blood sample deprived him of exculpatory evidence of voluntary intoxication and (2) the State's use of the negative test results was highly misleading and prejudicial. The OCCA denied relief on both claims. *Martinez*, 371 P.3d at 1110, 1111. The Court finds that the OCCA's decision was reasonable.

### 1.    *Clearly Established Law*

The Due Process clause imposes a limited duty on the police to preserve exculpatory evidence. *California v. Trombetta*, 467 U.S. 479, 488 (1984). Whether the evidence must be preserved depends on the nature of the evidence. If the evidence has "an exculpatory value that was apparent before [it] was destroyed," the Due Process Clause offers relief. *Trombetta*, 467 U.S. at 489. However, if the evidence is only "potentially useful," a defendant must prove that the police acted in bad faith by destroying the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)

As for whether the admission of negative test results was so prejudicial as to violate due process, the Court relies on the fundamental fairness analysis set out in section E(2).

2.    *Analysis*

AEDPA "'requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final.'" *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (quoting *Williams*, 529 U.S. at 380). Clearly established law refers to Supreme Court holdings, which "must be construed narrowly and consist only of something akin to on-point holdings." *Id.* A law is not clearly established if it "'imposes a new obligation on the States or the Federal Government.'" *Id.* (quoting *Williams*, 529 U.S. at 381).

Here, the bulk of Petitioner's claim is contingent upon a finding that the Due Process clause required the police to collect certain evidence from Petitioner in a more timely manner. But that rule is far from clearly established by Supreme Court precedent. In *Trombetta* and *Youngblood*, the Supreme Court addressed the police's failure to preserve samples taken from the defendant, but it has never found that the Due Process clause requires the police to collect evidence in a particular way or perform specific investigatory functions. If anything, the Supreme Court has rejected that approach. *See Youngblood*, 488 U.S. at 58-59 (strongly disagreeing "that the Due Process Clause is violated when the police fail to use a particular investigatory tool" and noting that "the police do not have a constitutional duty to perform any particular tests"). Because Supreme Court precedent must be construed narrowly under AEDPA, Petitioner is not able to show the OCCA's decision is contrary to or an unreasonable application of any clearly established federal law. The absence of clearly established federal law is dispositive of this facet of his claim. *See House*, 527 F.3d at 1018. However, even if the standards for preserving evidence

35

articulated in *Trombetta* and *Youngblood* did control, Petitioner's claim would still fail.

Petitioner makes several arguments in an attempt to overcome AEDPA's obstacles to relief. First, Petitioner argues that the OCCA's decision is contrary to *Trombetta* because the evidence was more than potentially exculpatory and, therefore, he was not required to show bad faith. The OCCA recited the rule from *Trombetta*, but utilized *Youngblood's* bad faith standard because the evidence was only potentially useful. That decision is neither contrary to *Trombetta* nor unreasonable.[12]

*Trombetta* applies when the government destroys evidence whose exculpatory value is "apparent" before destruction. *Trombetta*, 467 U.S. at 489. Evidence that "might conceivably" assist the defendant, *id.*, or that "might have exonerated the defendant," *Youngblood*, 488 U.S. at 57, does not have apparent exculpatory value. *See also United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) (finding that potential results from further tests were not apparently exculpatory under *Trombetta* because it was not apparent what the tests would reveal). While an earlier blood draw from Petitioner might have bolstered a voluntary intoxication defense by showing a high level of intoxication, it was just as likely that it would show a level of intoxication that was lower than the defense would have expected. This is particularly true given the conflicting evidence regarding Petitioner's level of intoxication while he was in policy custody.[13] Further, the availability of a

---

[12] The Court disagrees with Respondent's argument that Petitioner's claim based on *Trombetta* is unexhausted.

[13] For example, while police officers noted that Petitioner smelled of alcohol or had slurred speech, they also observed that he had control over his motor skills, was able to compose a legible written statement, and appeared to understand his *Miranda* rights. Trial Tr. vol.

voluntary intoxication defense depends on the defendant's ability to form a specific criminal intent, not on whether he exceeded a particular blood alcohol level. Thus, while a blood test *may* help to establish the defense, it is not inherently exonerative. Because Petitioner "can only speculate about the potentially exculpatory nature" of the test results, the evidence is only potentially useful. *Bullock*, 297 F.3d at 1056. The OCCA's decision is not unreasonable or contrary to *Trombetta*.

In his second attempt to overcome AEDPA's obstacles, Petitioner argues that if *Youngblood's* bad faith standard controls, it was unreasonably applied by the OCCA. He claims that the OCCA ignored *Youngblood's* instruction that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56, n*. Petitioner relies on the fact that the police eventually gathered a blood sample to argue that they appreciated its exculpatory value and the therefore acted in bad faith by not obtaining one earlier.

But as previously explained, the police were not on notice that a blood alcohol test would be exculpatory. Rather, it was "simply an avenue of investigation that might have led in any number of directions." *Id*. Like the police in *Youngblood*, who went to the trouble of gathering physical samples from the defendant but did not act in bad faith by failing to preserve or test them, the police in this case did not act in bad faith by failing to

---

VI at 136, 235-40. Thus, while the police certainly had reason to believe Petitioner had been drinking, it was not apparent that a blood alcohol test would exculpate him.

take an earlier blood draw from Petitioner.  *See id.* at 58.  The mere fact that the police eventually sought a blood sample from Petitioner does not alter that conclusion.  Other factors also weigh in favor of finding the police did not act in bad faith:  the potential exculpatory value of the evidence was based on conjecture; the police did not have sole control of the evidence as they had to rely on Petitioner's consent to take a blood draw or seek a warrant; and the test results, although used to refute claims of intoxication, were not central to the prosecution's case.  *See United States v. Ray*, 899 F.3d 852, 864-65 (10th Cir. 2018) (setting forth factors to consider when determining whether the government acted in bad faith).  Thus, at the very least, the OCCA's conclusion that the police did not act in bad faith is not unreasonable.

Third, Petitioner argues that the OCCA based its decision on two unreasonable factual determinations: (1) that Petitioner created some delay when he refused to give a blood sample and (2) that the prosecution did not deny Petitioner had been drinking. Neither of these factual determinations are unreasonable.  Petitioner did contribute to a delay in acquiring the blood sample by refusing to consent and there is nothing in the record suggesting that investigators intentionally delayed making their request for a blood draw to Petitioner.  As to the prosecution's argument, he clearly stated in closing argument that he "got the impression [Petitioner] was drinking" and the "we don't contest that fact." Trial Tr. vol. IX at 46.

Petitioner additionally argues that the admission of the blood test results taken approximately twelve hours after the crime violated due process because the results were highly prejudicial and misleading.  But again, Petitioner cannot overcome AEDPA's

hurdles because the OCCA's decision and factual findings are reasonable.  As the OCCA recognized, the probative value of the results was low given the length of time that elapsed between the crime and the blood draw.  Nevertheless, they provided at least some information about the overall investigation and Petitioner's drug and alcohol use.  Further, there was nothing misleading or false about the test results or the testimony surrounding them because the jury was made aware of the extended time lapse.  Finally, Petitioner's claim that he was unduly prejudiced by the results because they led his trial counsel to forego requesting a voluntary intoxication instruction is belied by the record, which shows that trial counsel strategically declined to request the instruction because he thought there was a risk it would confuse the jury as to who carried the burden of proving malice.  Trial Tr. vol. IX at 5-6.  The admission of the test results did not render his trial fundamentally unfair.

### 3.    Conclusion

Neither the police's failure to collect an earlier blood sample nor the State's use of the negative test results violated due process.  Accordingly, the Court finds that the OCCA's decision denying relief on both claims was reasonable.  Petitioner is not entitled to relief on Ground Six.

### G.    Ground Seven: Cumulative Error

In his final ground for relief, Petitioner argues that even if individual errors were harmless, the combined effect of the errors deprived him of a fair sentencing.  Petitioner raised this claim on direct appeal and the OCCA denied relief, finding that the potential cumulative effect of the minor errors at trial did not impact the fairness or reliability of the

proceedings.  *Martinez*, 371 P.3d at 1119.

The cumulative error analysis addresses the possibility that two or more individually harmless errors might have a "cumulative effect on the outcome of the trial such that collectively they can no longer be determined to be harmless." *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003).  To obtain habeas relief, "the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

This Court has not found error.  Therefore, the cumulative error analysis is unwarranted.  Petitioner is not entitled to relief on Ground Seven.

## IV.    Conclusion

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's petition for writ of habeas corpus [Doc. No. 16] is hereby **DENIED**.  The remainder of Petitioner's Motion for Discovery [Doc. No. 17] and Motion for Evidentiary Hearing [Doc. No. 29] are also **DENIED**.  Judgment will be entered accordingly.

## V.    Certificate of Appealability

As a final matter, the Court must consider whether to issue a certificate of appealability.  Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the Court declines to do so.

Pursuant to 28 U.S.C. § 2253(c)(1), Petitioner may not appeal the denial of his

habeas petition unless he obtains a certificate of appealability ("COA").  A COA is claim-specific and appropriate only if Petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2), (c)(3).  When a claim has been denied on the merits, the COA standard is whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004) (AEDPA's deferential standard must be incorporated into the consideration of a certificate of appealability).  When a claim has been denied on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA may issue only when Petitioner shows that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Having thoroughly reviewed each issue raised by Petitioner, the Court concludes that, for the reasons set forth herein, none satisfies the standard for the granting of a COA. Therefore, the Court **DENIES** a COA as to all of Petitioner's grounds for relief.

IT IS SO ORDERED this 6th day of December, 2022.

TIMOTHY D. DeGIUSTI
Chief United States District Judge